**NATIONAL WILDLIFE FEDERATION,** **Idaho Wildlife Federation, Petitioners,**

**and**

**The Nez Perce Tribe,** **Intervenor-Petitioner,**

v.

**FEDERAL ENERGY REGULATORY** **COMMISSION, Respondent.**

No. 84–7325.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 11, 1985.

Decided Sept. 30, 1986.

Terence L. Thatcher, Portland, Or., for petitioners.

Wilfrid Longeteig, Strom & Longeteig, Craigmont, Idaho, for intervenor-petitioner Nez Perce Tribe.

Kenneth O. Eikenberry, Atty. Gen., D. Anthony Weeks, Asst. Atty. Gen., Olympia, Wash., for amicus curiae Washington State Dept. of Fisheries & Game.

Joshua Z. Rokach, General Counsel, F.E.R.C., Washington, D.C., for respondent.

Frank W. Ostrander, Douglas J. Balfour, Northwest Power Planning Council, Portland, Or., for amicus curiae Northwest Power Planning Co.

Before BROWNING, Chief Judge, ALARCON, Circuit Judge, and STEPHENS,* District Judge.

---

* Honorable Albert Lee Stephens, Jr., Chief Judge Emeritus, United States District Court for the Central District of California, sitting by designation.

1. Our jurisdiction has been challenged with respect to appeals from issuance of two of the permits because the Federation was not a party to these application proceedings before the Commission. However, the Commission granted the Federation permission to intervene before denying the petitions for rehearing.

The United States argues we lack jurisdiction over all the appeals because only final orders are reviewable under the Federal Power Act, 16 U.S.C. § 825*l*(b), *Steamboaters v. FERC,* 759 F.2d 1382, 1387–88 (9th Cir.1985), and the grant of a preliminary permit is not a final order because it does not finally settle the rights of any persons. It is well-established that orders granting preliminary permits are final and therefore reviewable. *City of Bedford v. FERC,* 718 F.2d 1164, 1168 (D.C.Cir.1983); *Delaware*

**JAMES R. BROWNING, Chief Judge:**

**I**

The Director of the Office of Electric Power Regulation of the Federal Energy Regulatory Commission ("Commission") issued seven preliminary permits to develop license applications for hydroelectric power projects along the Salmon River, flowing in a 420 mile-long arc through central Idaho. The Nez Perce Tribe ("Tribe"), and the National Wildlife Federation and Idaho Wildlife Federation (jointly referred to as "the Federation"), appealed to the Commission. The Commission affirmed the Director's action, 25 F.E.R.C. ¶ 61,410 (1983), and denied rehearing. 26 F.E.R.C. ¶ 61,330 (1984). Petitioners sought review.

The Federation contends the Commission violated the Federal Power Act, 16 U.S.C. §§ 791a–793, 796–818, 820–825u (1982), the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370a (1982), and the Pacific Northwest Electric Power Planning and Conservation Act ("Northwest Power Act"), 16 U.S.C. §§ 839–39h (1982). The Nez Perce Tribe argues that the Commission has breached its obligations under the Nez Perce Treaty, 12 Stat. 957 (1855). We conclude the order must be set aside and the matter remanded to the Commission for further consideration.[1]

*River Basin Commission v. FERC,* 680 F.2d 16, 16 (3d Cir.1982); *see also Appomattox River Water Authority v. FERC,* 736 F.2d 1000 (4th Cir.1984) (reviewing grant of permit without discussing jurisdiction); *Northern Colorado Water Conservancy District v. FERC,* 730 F.2d 1509 (D.C.Cir.1984) (same); *City of Dothan v. FERC,* 684 F.2d 159 (D.C.Cir.1982) (same). The United States objects that plaintiffs in these cases were competitors, not "environmental intervenors." But this objection goes not to the finality of the order but to the question of standing.

We are satisfied appellants have standing. The grant of a preliminary permit places at least two concrete burdens on appellants. First, the grant of a preliminary permit increases the chances that a license will be granted to that applicant by eliminating the incentive for others to file competing license applications since the permittee is given a statutory priority and the right to amend. Had the permits in question not been granted, the incentive would have remained for competing developers to submit al-

## II

The Federation contends the Federal Power Act, 16 U.S.C. § 803(a), requires the Commission to develop a comprehensive plan for hydroelectric development in the Salmon River Basin before granting preliminary permits for particular projects, to direct permittees to conduct studies that would provide data necessary to evaluate the cumulative impacts of proposed projects, to impose uniform study guidelines, and to collect baseline environmental data. The Commission concedes the Federal Power Act requires development of a comprehensive plan and consideration of cumulative impacts before licenses are issued, but denies the necessity for these steps before preliminary permits are issued. The question presented is whether the Commission's decisions not to develop a comprehensive plan, not to require permittees to study cumulative impacts, not to impose uniform study guidelines on permittees, and not to collect baseline environmental data, were arbitrary, capricious, not in accordance with law, or unsupported by the record.

Congress' commitment to coordinated study and comprehensive planning along an entire river system before hydroelectric projects are authorized is a central feature of the Federal Power Act. This concern is reflected in the legislative histories of the Federal Power Act and its precursors. The General Dam Act of 1910 "provided that there should be a comprehensive plan for the development of a river and waterway system; that each particular dam project should be given consideration not only with a view to the locality where constructed but with reference to the entire water system of which it constituted a part...." [2] The Newlands Act of 1917, which was directed at the same purposes as the Federal Power Act,[3] required "the making ... [of] a comprehensive plan for the doing of whatever may be required to control and regulate the flow of that river, prevent floods, and standardize the navigable stage of the river throughout the year...." [4] As the Federal Power Commission has recognized, "the concept of considering a particular water-shed as a whole is the backbone of the Federal Power Act." *The California Oregon Power Co.*, 23 F.P.C. 59, 61 (1960).[5]

The Federal Power Act requires that a comprehensive plan for river basin develop-

---

ternative project proposals, some of which might have been more favorable to appellants. Appellants have suffered injury-in-fact because the opportunity for others to propose more favorable projects has been largely foreclosed by the grant of the preliminary permit. Moreover, once major expenditures have been made towards developing license applications for particular sites, which occurs upon the granting of preliminary permits, it will be much more difficult to create a plan that puts that site off-limits. See *Environmental Defense Fund, Inc. v. Andrus*, 596 F.2d 848, 853 (9th Cir.1979). Second, appellants have a statutory right to intervene in the licensing process. They have alleged they will be unable to participate effectively unless a comprehensive plan is first prepared, cumulative impacts are studied, uniform study guidelines are imposed, and baseline environmental information is collected. This allegation reflects injury-in-fact from the Commission's failure to develop a comprehensive plan before issuing preliminary permits.

The appeal from the order issuing the permit in No. 7184 (Sorensen) is dismissed as moot since the Commission subsequently revoked the permit.

2. Federal Power Commission Report (1919), *reproduced in* 3 B. Schwartz, *The Economic Regulation of Business and Industry: A Legislative History of U.S. Regulatory Agencies* 1841 (1973).

3. *See* Remarks of Sen. Jones, Senate debate on Water Power Act of 1920, 66th Congress, 2d Sess. (May 27–28, 1920), reproduced in Schwartz, *supra* at 2033; Remarks of Rep. Esch, House debate on Water Power Act of 1920, 66 Cong., 2d Sess. (May 4, 1920), reproduced in Schwartz, *supra* at 1997.

4. Remarks of Sen. Henderson, Senate debate on Water Power Act of 1920, 66 Cong., 2d Sess. (May 27–28, 1920), reproduced in Schwartz, *supra* at 2031.

5. In enacting the Northwest Power Act, Congress reaffirmed its commitment to comprehensive planning for entire river basins, specifically citing the need for comprehensive planning and the study of cumulative impacts of hydropower development to protect the anadromous fish resources of the Pacific Northwest. *See* H.R.Rep. No. 976, Pt. I, 96th Cong., 2d Sess. 1, 44–49 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad. News 5989, 6011–16.

ment be available before licensing.[6] The Act contains no express provision that such a plan must be developed before issuance of preliminary permits. Petitioners assert, however, that whether in every case the Commission must develop a comprehensive plan before issuing preliminary permits, in this case the Commission can discharge its statutory duties only by doing so.

The Federal Power Act and the regulations implementing the permit process demonstrate that the primary purpose for issuing preliminary permits is to induce the permittees to gather the information necessary for licensing.[7] Section 797(f) of the Act authorizes issuance of preliminary permits only "for the purpose of enabling applicants for a license hereunder to secure the data and to perform the acts required by section 802 of this title," which stipulates the requirements for filing a satisfactory license application.

The regulations specify the nature, form, and extent of the information a license applicant must gather at the permit stage. *See* 18 C.F.R. §§ 4.38–4.71 (1986). All preliminary permit applications must contain "a description of studies conducted or to be conducted." *Id.* at § 4.81(c). Certain studies are required in all cases. *Id.* The Commission usually specifies other studies that must be conducted in the particular

case. The Commission uses its control over the content of permit articles to require permittees to conduct "the type of permit studies that will elicit necessary information for licensing proceedings." Commission's brief at 9.

As the Federal Power Commission has said:

> The purpose of a preliminary permit is to enable an applicant to make his investigations, examinations and surveys, prepare his maps, plans and specifications, and estimates, make his financial arrangements, and gather whatever other data is required in order to obtain a license. The. intent of the Federal Power Act is to have applicants act diligently and complete all the necessary investigations during the period of the preliminary permit.

*Robert P. Wilson,* 28 F.P.C. 571, 573 (1962) (citation omitted). The Commission licensing decision is to be based on "the detailed studies and agency consultation to be conducted under the permit." *Appomattox River Water Authority v. FERC,* 736 F.2d 1000, 1003 (4th Cir.1984) (quoting *John J. Hockberger, Sr.,* 20 F.E.R.C. ¶ 61,087 (1982)).

If the needed information can be collected by permittees in the absence of a com-

---

**6.** 16 U.S.C. § 803 states in relevant part: "All *licenses* issued under this subchapter shall be on the following conditions: (a) That the project adopted ... shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan...." (Emphasis added.)

**7.** The secondary purpose of the permit process is to encourage applicants to invest time and money in proposals for development. Under the Federal Power Act, a license from the Commission is required to construct and operate hydroelectric facilities on waters under federal jurisdiction. 16 U.S.C. § 817; *see also Idaho Power Co. v. FERC,* 767 F.2d 1359, 1361 (9th Cir.1985). The license application procedure can be costly and protracted. *Sierra Club v. FERC,* 754 F.2d 1506, 1508 (9th Cir.1985). License applications must include, among other things, "[s]uch maps, plans, specifications, and estimates of cost as may be required for a full understanding of the proposed project." 16 U.S.C. § 802; *see generally* 18 C.F.R. §§ 4.41–4.71 (1986).

A preliminary permit gives the permittee a "priority of application for a license," 16 U.S.C. § 798, and thus encourages applicants to expend the resources necessary to prepare license applications. *City of Bedford v. FERC,* 718 F.2d 1164, 1166 (D.C.Cir.1983). The "priority of application" provision enhances the permittee's chances of obtaining a license. The Commission will consider competing license applications, but it must grant the license to the permittee if the permittee's proposal is "at least as well adapted as the plans of each other applicant to develop, conserve, and utilize in the public interest the water resources of the region...." 18 C.F.R. § 4.37(c)(1) (1986). If a competitor has a superior plan, the Commission must tell the permittee why its plan is not as well adapted and give the permittee a reasonable time to bring its plan up to the level of the competitor's plan. *Id.* at § 4.37(c)(2); *see generally Northern Colorado Water Conservancy District v. FERC,* 730 F.2d 1509, 1512 (D.C.Cir.1984).

prehensive plan, it may not be necessary to develop such a plan before preliminary permits are issued. If, on the other hand, the necessary information cannot be obtained unless a comprehensive plan is first developed, the Commission would abuse its discretion if it issued a preliminary permit without first developing a comprehensive plan. Permits issued in such circumstances could not serve the purpose defined by the statute and regulations.[8] Similarly, if the cumulative impacts of potential projects can be determined only by requiring permittees to conduct studies or collect data necessary to evaluate such impacts, the Commission would abuse its discretion if it failed to require permittees to make such studies or gather such data, absent some sound reason for the omission.[9]

In short, the issue before the Commission was whether the ecological system in the Salmon River Basin was so complex and the proposed power projects so numerous [10] that the Commission should have taken any of the following steps requested by petitioners before issuing the preliminary permits: (1) prepared a comprehensive plan; (2) required permittees to conduct studies to provide data by which cumulative impacts of proposed projects could be assessed; (3) collected baseline environmental data and furnished it to permittees; (4) included uniform study criteria and guidelines in the permit articles. The issue before the court is whether, given the evidence before it, the Commission abused its discretion in concluding that none of these measures was necessary to provide the Commission with the information needed to make a properly-informed licensing decision. Resolving this issue requires an examination of the events preceding the Commission's issuance of the permits in question.

Anticipating the large number of permit applications for hydroelectric development in what all concede is an ecologically sensitive area, the Federation sought to intervene in some of the early applications for permits and requested the Commission to prepare a comprehensive plan for the Salmon River Basin, to require permittees to

---

**8.** The First Annual Report of the Federal Power Commission (predecessor to the present Commission) reflects the understanding that at least in some cases, development of a comprehensive plan must precede the issuance of permits. The report refers to applications for developments on several rivers in which the proposals were so involved with other uses "that if the Commission is to comply with the requirements of the act as quoted [present section 803], it must make, or cause to be made, careful studies of the streams, and must have a consistent scheme of development outlined before *any permits* or licenses are issued." H.R. Doc. No. 242, 67th Cong., 2d Sess. 30 (1921) (emphasis added).

**9.** Although the Commission has the power to extend the terms of preliminary permits, no permit may remain in force for more than three years. 16 U.S.C. § 798; 18 C.F.R. § 4.82(a) (1986). During the term of the permit, a permittee must not only conduct the necessary studies, but also complete an acceptable license application:

Failure of a permittee to file an acceptable application for a license before the permit expires will result in loss of the permittee's priority of application for a license for the proposed project.

*Id.* at § 4.83(b). Thus, the permit process cannot be extended indefinitely to allow a permit-

tee to conduct further studies once a preliminary permit has been issued.

The Commission contends *Sierra Club v. FERC*, 754 F.2d 1506 (9th Cir.1985), supports its position that it has no duty under the Federal Power Act to take the actions requested by petitioners until it is time to make the licensing decision. *Sierra Club* involved claims under NEPA and the Raker Act, 28 Stat. 242 (1931). For reasons stated later we defer consideration of the NEPA problem. As to the Raker Act, our holding in *Sierra Club* was only that the particular determinations required under the Raker Act (the relationship between the project for which a preliminary permit was sought and the Hetch Hetchy system) could not be made until final plans for the project had been completed, and therefore could not and need not be made before the preliminary permit was issued. Among the many respects in which *Sierra Club* is distinguishable from this case is that we do not decide whether or not a similar result is appropriate, but only that the present record does not contain either a cogent rationale or substantial evidence to support it.

**10.** When the Commission issued the permits in question, nearly fifty permit applications were pending for developments in the Salmon River Basin. By the time the Commission denied the motions for rehearing, there were well over eighty such permit applications.

conduct studies designed to produce information from which the Commission could assess the likely cumulative impacts of proposed hydropower development, to require uniform study guidelines as a condition of the permit articles, and to collect baseline environmental data.[11]

The Commission created a special docket number for the petitions requesting coordination, comprehensive planning, and study of cumulative impacts. The Commission staff prepared two draft documents: one describing a methodology for assessing effects of hydroelectric development of the Salmon River Basin and the other outlining a system for classifying projects based on cumulative adverse environmental impact.

The Commission held public hearings on these documents in Boise, Idaho and Everett, Washington.[12] The Commission began the hearings by identifying their purpose as follows:

> The goal of these sessions is to obtain technical and scientific information. The staff intends to use that information to

prepare certain environmental guidance documents. These documents will address the cumulative effect issue pertaining to hydroelectric development of the Salmon River Basin.

These documents will be used by the FERC staff to review applications for preliminary permits, licenses and exemptions. These environmental documents should also serve as guidance to those agencies that are consulted during the license and exemption process.

The Federation, the Tribe, developers, state and federal agencies, and other interested parties participated in the hearings and presented extensive evidence. The Commission also received written comments. The United States National Marine Fisheries Service submitted a draft comprehensive development plan.

All of the evidence received at the hearings supported the need for development of a comprehensive plan before issuing preliminary permits, and for requiring permittees to study cumulative impacts.[13] Dr.

---

**11.** The Federation's reasons for its requests are as follows. Development of a comprehensive plan before the permit stage would ease the burdens on all interested parties by permitting a coordinated response to the basinwide plan; by identifying the number, type, and location of desirable projects within the Salmon River Basin; and by setting out the Commission's decisionmaking criteria so that all interested parties could respond meaningfully. Because projected power developments might have synergistic, cumulative impacts, the Federation maintained that studies conducted by permittees should collect data which would be useful to the Commission in evaluating cumulative impacts. The Federation sought uniform study guidelines to assure that data collected by various permittees and others would be directly comparable, thus avoiding the need to redo many studies when it came time to assess cumulative impacts and make licensing decisions. Similarly, the Federation requested collection of baseline environmental data to give permittees and others a uniform core of data on which to base their studies and reports, so that all studies would proceed from the same basic assumptions about the Salmon River Basin.

**12.** The Everett hearings dealt with proposed developments in the Snohomish, Skyhomish and Snoqualmie Rivers, and are the subject of the petition for review in *Washington State Depart-*

*ment of Fisheries v. FERC,* 801 F.2d 1516 (9th Cir.1986).

**13.** For example, Lorraine Bodi of the U.S. National Marine Fisheries Service stated that unless a comprehensive plan were first developed, "you can't see whether the studies [conducted under the preliminary permit] are helpful to accomplish the objective." Harold Miles of Idaho Consumer Affairs, Inc. testified that development of a comprehensive plan before issuing licenses was needed to direct developers to conduct the necessary studies. Jack Griswold of the Forest Service indicated that if a comprehensive plan were not developed before issuing preliminary permits, studies conducted by developers would frequently be inadequate and would have to be entirely redone. Tom Haislip, a developer, indicated that even a tentative comprehensive plan, or a plan limited to stream reaches instead of basinwide, identifying likely and unlikely development sites, would be a boon to developers because they would not have to spend money to study unfruitful developments. Roy Heberger, a biologist with the U.S. Fish and Wildlife Service, testified it would be impossible to designate some proposals as having no adverse impact without first developing a comprehensive plan, and that in his judgment no project's impact could be measured independently from the impacts of other proposed projects.

Carl Shuster, who chaired the hearings for the Commission, noted the importance of developing a basinwide comprehensive plan before issuing preliminary permits.[14] At the conclusion of the hearing Dr. Shuster said: "[W]e agree that you need site-specific information, and you need to assess cumulative impacts, and you need to have a basin plan." No evidence was received suggesting comprehensive planning should be deferred or cumulative impacts need not be studied.

Despite these extensive hearings on the question of whether to develop a comprehensive plan, require studies of cumulative impacts, impose uniform study guidelines, and collect baseline environmental data, the Commission did not address those issues at all. Instead the Director of the Commission's Office of Electric Power Regulations simply began issuing standard permits, including the seven challenged here.

In rejecting petitioners' appeal from the Director's action, the Commission gave three reasons for denying petitioners' re-quests: (1) its usual experience had been that standard permits issued before development of a comprehensive plan were satisfactory; (2) permittees might be put to unnecessary expense and effort if required to conduct cumulative impact studies; and (3) cumulative studies undertaken at the permit stage might be useless if many projects were abandoned before licensing.[15]

█ The Commission's decision is not supported by any evidence in the record, let alone "substantial evidence," as required by 16 U.S.C. § 825l(b). We are unable to determine on the present record whether the Commission's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1982).

█ As we have said, all of the evidence in the record suggests that some or all of the steps urged by petitioners are necessary if the Commission is to have the information necessary for the discharge of its statutory duty at the licensing stage. The reasons advanced by the Commission for

---

In a written submission to the Commission, Charles Bennett, Fisheries Biologist for the National Marine Fisheries Service, concluded:

> Data concerning the proposed projects, particularly their individual and cumulative impacts to anadromous fish resources ... [are necessary].... These information requirements cannot be met if exemptions and preliminary permits are issued on a staggered, case-by-case basis.
>
> The preceding information strongly indicates the need for a consolidated review of all small hydro projects now planned for the Salmon River Basin.

**14.** Dr. Shuster stated:

> I think the earlier that an applicant understands what will be required, the earlier that this be [sic] ground into the planning process, that the better it will be, but obviously this sort of thing generally is not what happens during the application for a preliminary permit, but because of the cumulative effect issue in the Salmon River Basin, I think it's imperative that this type of knowledge gets placed up front and is utilized at that point.

**15.** The Commission's opinion stated, in relevant part:

> Articles contained in the permits challenged here are designed to elicit information on potential environmental impacts and, impor-tantly, require the permittees to consult with relevant governmental agencies for views and recommendations on environmental studies. Based on our experience with these kinds of permit articles, we believe they will result in substantial and useful information on potential environmental effects, and will be adequate to enable the permittees to prepare acceptable license applications.
>
> We do not believe an additional and explicit requirement for detailed, coordinated studies geared toward cumulative environmental impacts would be appropriate. Such studies would be extremely costly and time consuming. Moreover, because many projects studied pursuant to permits are never proposed for licensing, many of these studies may never be used.[5] For these reasons, we choose not to impose this additional burden on permittees.
>
> [5] That many permittees will probably not file for licenses is particularly significant to the advisability of requiring cumulative environmental studies, as opposed to other types of studies. Cumulative study results may depend greatly on the number of projects evaluated; and if that number changes greatly from the permit stage to the licensing stage, information generated at the former may not be useful at the latter.

25 F.E.R.C. ¶ 61,410, at 61,920–21 n. 5 (1983) (footnote omitted).

**1512**

not developing a comprehensive plan, not requiring permittees to conduct studies designed to provide data to measure cumulative impacts, not formulating uniform study guidelines, and not collecting baseline environmental data, have no discernible support in the record. The Commission simply did not mention the extensive and uncontradicted evidence offered by petitioners in support of their requests. "Normally, an agency rule would be arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency...." *Motor Vehicles Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).[16]

The situation is not unlike that before the Supreme Court in *Udall v. FPC,* 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967). In *Udall,* the Federal Power Commission granted a license to build hydroelectric power projects without conducting "an exploration of all issues relevant to the 'public interest,'" *id.* at 450, 87 S.Ct. at 1724. Without deciding whether or not the license should have been granted, the Court vacated the Commission's decision, and remanded to the Commission with instructions to provide "an exploration of these neglected phases of the cases, as well as the other points raised by the Secretary." *Id.*

We do not hold the Commission must develop a comprehensive plan before issuing permits, must require permittees to collect data useful for studying cumulative impacts, must develop uniform study guidelines, or must collect baseline environmental data. We do hold the Commission's decision to reject these options is not sustainable on the present record.[17]

The Commission's conclusion that "based on its experience with these kind of permit articles, we believe they will result in substantial and useful information on potential environmental impacts," is in conflict with the statement of its own scientist, Dr. Shuster, that while the ordinary procedures worked in the ordinary cases, the unique nature of the Salmon River Basin and the large number of applications filed made it imperative that a comprehensive plan be prepared before preliminary permits were issued, that cumulative impacts be studied, and that uniform study guidelines be developed and included in the permit articles. The essential reason for the extensive hearings was that the projected development of the Salmon River Basin presented fundamentally different problems than the usual proposal for hydroelectric development. Without adequate explanation in the record, the Commission's run-of-the-mill experience with boilerplate permits was an inadequate basis for rejecting petitioners' requests.

The second reason given by the Commission for rejecting petitioners' proposals was that their implementation would be "costly

**16.** *See also Confederated Tribes and Bands of the Yakima Indian Nation v. FERC,* 746 F.2d 466, 472 (9th Cir.1984) (as amended) ("'The Commission must see to it that the record is complete. The Commission has an affirmative duty to inquire into and consider all relevant facts.'") (quoting *Scenic Hudson Preservation Conference v. FPC,* 354 F.2d 608, 620 (2d Cir.1965)); *Farmers Union Central Exchange, Inc. v. FERC,* 734 F.2d 1486, 1499 (D.C.Cir.1984) (as amended) (court "must conduct a 'searching and careful' inquiry into the record in order to assure itself that the agency has examined the relevant data and articulated a reasoned explanation for its action including a 'rational connection between the facts found and the choice made.'") (quoting in part *Burlington Truck Lines, Inc. v. United*

*States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)).

**17.** The Commission relies on *Appomattox River Water Authority v. FERC,* 736 F.2d 1000, 1004 (4th Cir.1984); *City of Dothan v. FERC,* 684 F.2d 159 (D.C.Cir.1982); and *Delaware River Basin Commission v. FERC,* 680 F.2d 16 (3d Cir.1982), for the proposition that the Commission is vested with authority to determine whether to conduct the detailed and sophisticated analyses required by the Federal Power Act at the licensing stage or at some earlier time. We do not dispute this proposition. We hold only that such a decision must be based upon stated reasons supported by the record.

and time consuming." There was no evidence as to cost involved; such testimony as there was suggested adoption of petitioners' proposals would reduce the costs associated with studying environmental impacts. Moreover, these costs must eventually be incurred to comply with the statutory mandate that before licensing, the projects be measured against a comprehensive plan. *See* 16 U.S.C. § 803(a). The Commission suggested that requiring these studies at the permit stage might impose unnecessary costs since "many projects studied pursuant to permits are never proposed for licensing, [and] many of these studies may never be used." But there is nothing in the record to indicate the Commission actually considered how many of the pending proposals for projects in the Salmon River Basin might be abandoned, or for what reasons—abandonment for reasons which would surface before the studies were conducted, for example, would impose no burden on the permittee. Nothing in the record indicates the Commission weighed the costs that might be incurred against the benefits the record established would flow from requiring such studies, or even that the Commission possessed facts to conduct such a balancing.

The Commission's third reason for rejecting petitioners' requests was that results of cumulative impact studies would vary greatly depending upon the number of projects built, and requiring such studies when the number and location of developments was not yet fixed would risk production of studies that were unusable. The argument proves too much. Some uncertainty will exist until all projects are completed. If the Commission's reasoning were accepted, it would never be necessary to evaluate potential projects in light of cumulative impacts.

The statute requires the Commission to measure proposed projects against a comprehensive plan. If the Commission had first prepared a comprehensive plan for hydropower development in the Salmon River Basin, establishing the optimal number, type, size and location of hydropower projects in the basin, cumulative impacts could be studied on the assumption that all projects detailed in the comprehensive plan eventually would be brought on line. Alternatively, permittees could have been required to conduct cumulative impact studies and prepare reports based on several development assumptions.

The Commission advanced no reason for refusing to collect baseline environmental data or to impose uniform study guidelines by way of permit articles. The advantage in uniformity and direct comparability of results is spelled out in the record. There is no support in the record for the Commission's rejection of these proposals.[18]

We conclude the challenged permits must be vacated and the matter remanded to the Commission for further consideration of the issues presented by petitioners under the Federal Power Act.

### III

■ The Federation contends the Commission breached the Northwest Power Act. The Northwest Power Act was adopted to "protect, mitigate and enhance the fish and wildlife, including related spawning grounds and habitat, of the Columbia River and its tributaries," 16 U.S.C. § 839(6), and to aid the development of hydroelectric power in the Columbia River Basin. *Id.* at § 839(1). The Federation argues the Commission violated the statute by ignoring the Fish and Wildlife Program promulgated by the Northwest Power Planning Council,[19] and by denying fish

**18.** The parties ask us to take judicial notice of and evaluate the cumulative study methodology called the Cluster Impact Assessment Program, which the Commission adopted during the pendency of this appeal. We decline to do so; we ordinarily review agency action on the record as it stood when the challenged action was taken. The Cluster Impact Assessment Program should be evaluated and explained by the Commission in the first instance.

**19.** The Council is an interstate compact organization created by the Northwest Power Act, 16 U.S.C. § 839b, *see Seattle Master Builders Association v. Pacific Northwest Electric Power and Conservation Planning Council*, 786 F.2d 1359,

and wildlife "equitable treatment," as required by the Act.

Congress directed the Council to develop a program to "protect, mitigate and enhance fish and wildlife ... while assuring the Pacific Northwest an adequate, efficient, economical, and reliable power supply." *Id.* at § 839b(h)(5). In response to this mandate, the Council issued its Fish and Wildlife Program nearly a year before the challenged permits were granted. The Northwest Power Act requires the Commission to "tak[e] into account at each relevant stage of decisionmaking processes to the fullest extent practicable, the program adopted by the [Northwest Power Planning] Council under this subsection." *Id.* at § 839b(h)(11)(A)(ii). The Council's Program expressly provided that regulators such as the Commission should "review all applications or proposals for hydroelectric development in a single river drainage simultaneously" and "assess cumulative environmental effects of existing and proposed hydroelectric development on fish and wildlife." Northwest Power Planning Council, Columbia River Basin Fish and Wildlife Program, § 1204(b)(1) (1982).

The Federation contends the Commission simply ignored the Council's Program. The Commission does not deny it. Instead the Commission argues the Northwest Power Act does not require the Commission to adopt the Council's conclusion that cumulative impact studies should be conducted as part of the preliminary permit process. This is nonresponsive: the Commission failed to consider the Council's Program at all—a clear violation of the Northwest Power Act's express requirement that the Council's Program be "tak[en] into account at each relevant stage." 16 U.S.C. § 839b(h)(11)(A)(ii).

The Commission contends permit proceedings are not a "relevant stage" within the meaning of the Northwest Power Act— that the only "relevant stage" is licensing. The statute requires consideration of the Council's Program "at each relevant stage," recognizing there is more than one. *Id.* Moreover, after holding hearings, developing a record, and soliciting further comments on the issuance of preliminary permits, the Commission can hardly argue it was not a "relevant stage" of the licensing process. As we have seen, issuance of preliminary permits and the formulation of their articles are of central importance in the process of licensing. *Northern Colorado Water Conservancy District v. FERC*, 730 F.2d 1509, 1512 (D.C.Cir.1984). The Commission has never stated why the preliminary permit stage is not a "relevant stage" within the meaning of the Northwest Power Act—indeed, the Commission appears never to have considered the question, except as a post hoc rationalization prompted by the administrative appeal.

Nothing in the Northwest Power Act supports the Commission's position; as petitioners point out, the express reference to preexisting permits in the Act's savings clause, 16 U.S.C. § 839g(i), would be unnecessary if permits were not within the statute's coverage. Section 1204(d)(1) of the Council's Program specifically indicates the Council's understanding that the Program is to be considered by the Commission at the permit stage.[20]

The Commission also maintains it is not required to consider the Council's Program because the Northwest Power Act imposes no new substantive requirements on federal agencies. But the Act specifically requires the Commission to take the Council's program into account "to the fullest degree practicable," 16 U.S.C.

1363–64 (9th Cir.1986), and is charged with developing a conservation and energy plan for the Pacific Northwest, *see* 16 U.S.C. § 839b(d)(1), and a fish and wildlife conservation program for the Columbia River and its tributaries. *See id.* at § 839b(h)(1)(A).

**20.** Section 1204(d)(1) of the Council's Columbia River Basin Fish and Wildlife Program reads:

The FERC shall require all applicants for licenses (including license renewals, amendments, and exemptions) and preliminary permits in the Columbia River Basin to demonstrate in their applications how the proposed project would take this program into account to the fullest extent practicable.

§ 839b(h)(11)(A)(ii), and we have already rejected the argument that the Act does not impose new substantive requirements on the Commission and other federal agencies. *Confederated Tribes and Bands of the Yakima Indian Nation v. FERC,* 746 F.2d 466, 473 (9th Cir.1984) (as amended).[21]

The Federation argues the Commission violated its duty to "protect, mitigate and enhance fish and wildlife ... [and to] provide[] equitable treatment for such fish and wildlife," 16 U.S.C. § 839b(h)(11)(A)(i), by refusing to gather information relevant to the cumulative impact of development proposals on fish and wildlife before issuing preliminary permits. We need not reach this issue. On remand the Commission must consider the evidence in the record, articulate reasons supported by the record for whatever decisions it makes, and consider the Council's Program to the fullest extent practicable. If and when a future appeal is taken, whether the consideration the Commission has given to fish and wildlife at this point satisfies the "equitable treatment" requirement will no longer be an issue.

### IV

If a proposal for action may significantly affect the environment, NEPA requires the responsible agency to prepare an Environmental Impact Statement, to state why no Environmental Impact Statement is required and prepare an Environmental Assessment, or to determine that neither is required (categorical exclusion). 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3–1501.4 (1985); *see also Sierra Club v. FERC,* 754 F.2d 1506, 1509 (9th Cir.1985). The Federation maintains the issuance of preliminary permits might significantly affect the environment, and therefore the Commission should have prepared an Environmental Impact Statement or an Environmental Assessment before issuing permits. The Federation also argues the Commission's decision to issue preliminary permits before

developing a comprehensive plan constitutes the "[a]doption of official policy ... [or] systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive," 40 C.F.R. § 1508.18(b)(1)–(3) (1985), to which NEPA would apply, and the Commission therefore should have prepared an Environmental Impact Statement or Environmental Assessment on its decision to issue permits before developing a comprehensive plan.

We do not reach petitioners' NEPA claims. If the Commission adopts petitioners' position and requires permit studies geared to a comprehensive plan, the NEPA claim will become moot. If, on the other hand, the Commission rejects petitioners' claim with a statement of reasons based upon the record, and also takes the Council's Program into account to the fullest extent practicable, the Commission's decision may constitute a satisfactory Environmental Assessment, *cf. Jones v. Gordon,* 792 F.2d 821, 828 (9th Cir.1986) (quoting *Steamboaters v. FERC,* 759 F.2d 1382, 1393 (9th Cir.1985)), even assuming the decision to defer comprehensive planning is governed by NEPA.

### V

The Nez Perce Tribe contends the Commission: (1) violated the Nez Perce Treaty by interfering with the Tribe's treaty right to take fish, and (2) breached the Commission's fiduciary duty towards the Tribe by failing to consider the Tribe's interests. We do not reach the Tribe's arguments. The questions of interference with treaty rights and breach of fiduciary duty will be moot if the Commission accepts petitioners' position and requires permittees to conduct studies with reference to a comprehensive plan, or will present substantially different issues if the Commission states reasons for its decision, supported by the record, and takes the Council's Program into account

---

**21.** *See also* 126 Cong.Rec. 29,809 (1980) (statement of Rep. Dingell) (the Northwest Power Act "creates a new obligation on the region, the

BPA, and other Federal agencies to protect, mitigate and enhance fish and wildlife. It is a provision for which I am the chief sponsor.").

to the fullest degree practicable. *See Confederated Tribes,* 746 F.2d at 477.

No. 7184 DISMISSED AS MOOT.

Nos. 6442, 6230, 6810, 6811, 6591, and 6702 VACATED AND REMANDED.