**CITY OF SEATTLE, Petitioner,**

**Puget Sound Power and Light Company, Petitioner–Intervenor,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Public Utility Dist., No. 1 of Pend Oreille County, Washington; Bonneville Power Administration, Respondent–Intervenor.**

**No. 89–70486.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 3, 1990.

Decided Jan. 15, 1991.

William H. Patton, Asst. City Atty., Seattle, Wash., for petitioner.

Donald G. Kari and Sherilyn Peterson, Perkins Coie, Bellevue, Wash., for petitioner-intervenor.

Dwight C. Alpern, F.E.R.C., Washington, D.C., for respondent.

William J. Madden, Jr., Bishop, Cook, Purcell & Reynolds, Washington, D.C., Jerry K. Boyd, Payne, Hamblin, Coffin, Brooke & Miller, Spokane, Wash., and Sarah R. McNary, Bonneville Power Administration, Portland, Or., for respondent-intervenor.

Before NELSON, O'SCANNLAIN and FERNANDEZ, Circuit Judges.

FERNANDEZ, Circuit Judge:

Public Utility District No. 1 of Pend Oreille County, Washington (PUD) petitioned the Federal Energy Regulatory Commission (FERC) for an order interpreting a license which had been granted to the City of Seattle (Seattle). The license provision in question gave PUD certain rights to receive power from Seattle. FERC issued an order, which had the effect of requiring Seattle to abide by the terms of the license, and which also interpreted the scope of the license in a manner favorable to PUD. We uphold the determinations by the FERC.

BACKGROUND

In the 1950's, PUD and Seattle competed for the right to install a hydroelectric facility on the Pend Oreille River (the Boundary Project). Ultimately, the Federal Power Commission (FPC) issued the license to Seattle, but because it was recognized that it was somewhat unjust to prefer Seattle to the energy district in the county where the project was to be located, an ameliorative provision was placed in the license. That provision is found at Article 49 and reads as follows:

> The Licensee shall assign 48,000 kilowatts to the PUD from the Boundary Project at the PUD's system load factor, any part or all of which shall be available to the PUD at cost upon two years' notice by the PUD, to meet the load requirements of present or potential consumers (not including purchasers for resale) within the PUD's service area; *Provided*, That the amount of power made available by this article shall be reduced by the amount of any power recaptured by the PUD under the Box Canyon contract with Seattle and sold for use outside Pend Oreille County.

While the provision was designed to balance the scales, it was not all that PUD desired. PUD, therefore, did not satisfy itself with that benefit. Rather, it continued to contest Seattle's rights, but it was ultimately unsuccessful in that contest. See *Public Util. Dist. No. 1 v. FPC*, 308 F.2d 318 (D.C.Cir.1962), *cert. denied*, 372 U.S. 908, 83 S.Ct. 719, 9 L.Ed.2d 716 (1963); *see also City of Seattle v. Beezer*, 376 U.S. 224, 84 S.Ct. 709, 11 L.Ed.2d 656 (1964).

For many years thereafter, PUD did not seek to use the boon given to it by Article 49. However, in 1985 it did seek to draw upon two megawatts of power, and that was provided to it under certain interim agreements. It then occurred that an opportunity presented itself to PUD when a new large customer, the Ponderay Newsprint Company (Ponderay), sought to enter PUD's service area in Pend Oreille County.

That company would need a substantial amount of power, and PUD contracted to supply that power to the company. Of course, PUD had to find the necessary supplies, so it turned to Article 49 and requested 24 megawatts from that source. It also contracted with the Bonneville Power Administration (BPA) for the supply of additional power, and BPA undertook to build the transmission lines necessary to move the electricity to Ponderay. Seattle, which was now called upon to perform under Article 49, was displeased with that prospect and asserted that it need not do so at all. Given Seattle's position, PUD petitioned FERC to interpret the license and to grant relief against Seattle.

Seattle responded. It claimed that Article 49 could not be enforced because PUD had continued to contest Seattle's rights after the license was issued. It also contended that BPA's involvement was illegal, and that should preclude PUD from demanding the power. Moreover, it asserted claims that the power should be sold at Seattle's cost of replacing the number of megawatts taken, and that allocation of costs on a demand-related basis would be unfair to it.

BPA intervened to assert that FERC lacked jurisdiction to review its relationship with PUD, and to suggest that Seattle's attack came too late in any event. Puget Sound Power and Light Co. also intervened. It asserted that Seattle's attack came too early.

FERC did not agree with Seattle and, without holding an evidentiary hearing, FERC issued its order to that effect. It also reiterated that position when it turned aside a motion by Seattle for reconsideration.

Seattle then filed this Petition for Review with us, in which it raised the already mentioned issues and, in addition, asserted that FERC erred when it failed to hold an evidentiary hearing.

## JURISDICTION AND STANDARD OF REVIEW

■ We have jurisdiction to entertain this Petition for Review pursuant to 16 U.S.C. § 825*l*.

We examine decisions of FERC to determine whether they are "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with law." *The Steamboaters v. FERC*, 759 F.2d 1382, 1388 (9th Cir.1985). In so doing, we generally "show great deference to [FERC's] interpretation of the law which it is charged with administering." *Id.*

## DISCUSSION

### A. *FERC's Failure to Hold an Evidentiary Hearing.*

At the threshold we are met with Seattle's claim that FERC's decision was arbitrary because it failed to grant a hearing on Seattle's claims. For that proposition Seattle cites *National Wildlife Fed'n v. FERC*, 801 F.2d 1505 (9th Cir.1986). Undoubtedly, as that case indicates, it would be arbitrary for FERC to ignore the evidence before it or to fail to consider all proper aspects of the issues with which it was faced. *Id.* at 1511–12. That, however, is of no help to Seattle in this case.

■ Here, as the ensuing discussion will underscore, the situation is like the one dealt with in *Sierra Ass'n for Env't v. FERC*, 744 F.2d 661 (9th Cir.1984). Here, as there, the issues before FERC required no evidentiary hearing, for they raised no material issues of fact. Rather, they were legal questions based upon an historical factual record that was not in real dispute. The resolution of the issues before FERC simply did not require a hearing under the circumstances of this case.

Seattle also complains of FERC's refusal to conduct an informal conference between it and PUD. It points, however, to no authority that would require an informal conference. At any rate, even though PUD was recalcitrant on the issue, FERC made it quite clear that it would render informal aid if both parties wanted it.

We must, of course, be satisfied that FERC "properly addressed all the relevant

factors in dispute and that a formal hearing was unnecessary." *Pacific Gas & Elec. Co. v. FERC,* 746 F.2d 1383, 1386 (9th Cir.1984). We are. Beyond that, we allow FERC "wide discretion in selecting its own procedures." *Id.*

In short, the procedures used here did not deprive Seattle of any rights.

### B. *Interpretation of the License.*

■ The principal issue before FERC was the proper interpretation of Article 49 of the license. Its interpretation is entitled to deference. *Pacific Gas & Elec. Co. v. FERC,* 720 F.2d 78, 84 (D.C.Cir.1983). We have emphasized the fact that in the absence of ambiguity FERC must ascertain the meaning of contracts it considers from their language and "without resort to parol or extrinsic evidence." *PG & E,* 746 F.2d at 1387. Of course, FERC's special expertise in this area helps it to perceive the plain meaning of the language used, and that is still another reason for us to show deference to its interpretations. This is well delineated by the analysis of the District of Columbia Circuit in a PG & E case, where the court pointed to the sensible reading of a license and went on to note its deference to FERC's congruent interpretation. 720 F.2d at 91–92.

With these considerations in mind, we turn to the license issues.

### (1) *The Claim of Reciprocal Conditions.*

■ We have already set out the full text of Article 49 of the license. As is apparent, it plainly states that Seattle *shall* assign 48 megawatts to PUD from the Boundary Project. That statement contains no restrictions or conditions, either precedent or subsequent, with the sole exception of a proviso at the end of the article itself. Seattle, nevertheless, claims that there is a condition. It does not point to the license itself to demonstrate that, but claims, instead, that there was an implied condition that PUD would stop fighting. In other words, it acts as though the license were a kind of settlement of its dispute with PUD, and asserts that PUD violated that settlement when it went on pressing its claims.

As FERC noted, there simply is no way to tease any such condition out of the words of the license. Moreover, even if one looks at the order the FPC made when Article 49 was added, that order does not, in any way, reflect an intent to impose any such condition. The FPC did not attempt to reify what might have been Seattle's fondest wishes, or at least the wishes that Seattle has now. Instead, the discussion of the FPC revolved around fairness—fairness to the local entity, PUD, which was losing a project right in its own county, and fairness to the people of that county. There was not the slightest hint that PUD must happily accept what it might have considered little more than a sop at that time; there was no hint that PUD must simply give up its attempt to secure the Boundary Project for itself. Simply put, the license is free from ambiguity, and even extrinsic evidence fails to support Seattle's view.

We thus find ourselves arriving at the same point the District of Columbia Circuit did when it decided *PG & E;* our interpretation "squares precisely with FERC's interpretation of the license, an interpretation to which we owe deference." 720 F.2d at 92.

### (2) *The "At Cost" Requirement.*

■ The second interpretive issue deals with the price at which Seattle is to make the energy available to PUD.

The first arrow in Seattle's quiver is a claim that it should be able to supply the energy at the cost it will have to pay for alternate power. It need not, it says, supply Boundary Project power using that project's cost factors. As Seattle sees it, when it releases a unit of energy to PUD, it will be necessary to purchase a replacement for that unit elsewhere in order to supply Seattle's own needs. That is what PUD must pay, says Seattle. In other words, the license provision accomplished little or nothing. Instead of PUD's purchasing power in the open market, Seattle

will do so and will charge PUD for the cost of that power.

However, as FERC pointed out, the clear intent of the license provision was to relieve PUD "of the need to acquire higher cost alternative power." Seattle's position makes the provision little more than a pass through of the more costly alternative power. FERC rejected that interpretation; properly so. Were it otherwise, Seattle would have, in effect, achieved the virtual repeal of Article 49.

Here too, logic, the plain meaning of the license, and FERC's determination all coalesced. There is not even the slightest hint of arbitrary or capricious action on the part of FERC, and its determination must be upheld.

Seattle's last arrow presents a claim which is somewhat more complex on its surface. At root, however, what Seattle attempts to claim is that FERC erred when it applied its traditional rule for allocation of costs of hydroelectric projects.

As FERC pointed out in *Nantahala Power & Light Co.*, fixed costs are usually treated as demand-related, whereas variable costs are treated as energy-related. 15 FERC para. 63,014 at 65,044–45 (1981), *aff'd*, 19 FERC para. 61,152, *aff'd*, 727 F.2d 1342 (4th Cir.1984). Fixed costs are generally those which do not vary with output. *Id.* They are related to system capacity. In general, that properly defines a hydroelectric project, for those projects do not usually have variable costs, such as the price of fuel. There is no indication that the Boundary Project is any different from other hydroelectric facilities and no reason why we should overturn FERC's decision that it is not.

In fine, there is nothing arbitrary or capricious in FERC's construction of this part of the license.

C. *Customer Requirements.*

Seattle next contends that PUD has not really asked for this energy in order to meet the requirements of its own customer, and, thus, that PUD cannot demand Article 49 power.

The first ground of this claim is a bit convoluted. It cannot be gainsaid that PUD has contracted to supply power to a customer in its own service area. As already pointed out, a part of that is to come from BPA and a part from Seattle. However, the actual electrical line is being built by BPA to the Ponderay plant. Thus, says Seattle, since energy will flow directly over a BPA line to Ponderay, it is not really PUD's power which is being supplied.

In these days of interconnected power systems it does not ring true when a party speaks in language which suggests that there is something unique about the power flowing within each system. We must assume that no party to this case really believes any such thing. It hardly matters whether a particular electron starts in one place or another; the flow along the system is essentially one of fungible matter. Given that, the fact that the particular energy reaching Ponderay will flow through BPA lines is simply outside the point. PUD, not BPA, has a contractual obligation to supply the customer, Ponderay. Where it gets the energy is, for present purposes, of no interest to the customer; nor does the customer care about how PUD gets the energy to the site in question. Nor, at this time, should we or FERC.

What is known is that PUD has the right to receive energy from Seattle if it wishes to supply that to its own customer, Ponderay. That is precisely what PUD seeks to do, and Seattle can hardly complain of it.

But, says Seattle, the relationship of BPA to this whole arrangement is wrongful because it constitutes a violation by BPA of the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. §§ 839–839h (Northwest Power Act). Seattle claims that BPA has created a new direct service customer, de facto, which is a violation of the Northwest Power Act. *See* 16 U.S.C. § 839c(d)(2).

Even if some violation of the Northwest Power Act were taking place, Seattle has failed to show just how that affects construction or enforcement of Article 49 of the license. More importantly, it has failed to demonstrate how FERC would have jur-

isdiction to review the actions of BPA in that regard. FERC said it had no such jurisdiction, and we agree.

There can be little doubt that FERC has some limited jurisdiction to review·the actions of BPA. That is basically limited to review of BPA's rate determinations. 16 U.S.C. § 839e. *See Public Util. Comm'n v. United States Dep't of Energy,* 33 FERC para. 61,235 at 61,489 (1985). Even there, the scope of review has definite limits. In *Central Lincoln Peoples' Util. Dist. v. Johnson,* 735 F.2d 1101 (9th Cir. 1984), for example, we explored the history of the Northwest Power Act and pointed out FERC's limited role, even in the rate-making area. We recognized that rate review could, in theory, be expansive enough to cover much of what BPA did, but we. emphasized that the Northwest Power Act structure contemplated a more limited oversight role. *Id.* at 1114. Congress, we held, "did not intend FERC review for compliance with all governing statutes." *Id.* at 1115. More recently, we have underscored that by holding that FERC's function is to approve or disapprove the rates set by BPA, not to impose its own rate structure. *Aluminum Co. of America v. Bonneville Power Admin.,* 903 F.2d 585, 593 (9th Cir. 1989). We went on to state that it was not for FERC to hold a new evidentiary hearing simply because it found the record before BPA to be inadequate. *Id.* at 593–94.

Nor does *National Wildlife Fed'n v. FERC,* 801 F.2d 1505 (9th Cir.1986), affect this result. That case simply dealt with 16 U.S.C. § 839b, a provision concerned with assessment of the environmental effects of hydroelectric power, and one which, we held, requires FERC to consider the program of the Conservation Planning Council when the issuance of permits is under consideration. *See id.* at 1513–15. That case does require FERC to adhere to the statutes which limit and guide it. That is a far cry from requiring FERC to meddle in every decision by BPA as the latter interprets and applies the statutory authority under which it must operate. *See* 16 U.S.C.

§ 839c. That kind of review is what FERC is not authorized to conduct. *See Aluminum Co. of America,* 903 F.2d at 593–94; *Central Lincoln,* 735 F.2d at 1114–15.

On the other hand, those who disagree with BPA decisions regarding the proper way to sell power to entities such as PUD and the proper methods of conducting that power to PUD or its customers are not without a remedy. They may challenge the decisions of BPA before that agency, and if they are aggrieved by those decisions they may seek direct review in this court pursuant to the Northwest Power Act. 16 U.S.C. § 839f(e)(5). What Seattle has done is attempt to obtain that review indirectly by first complaining of BPA's action to FERC and then attempting to seek review of that action in an appeal from FERC's refusal to take jurisdiction. That Seattle cannot do.

The proceeding before FERC involved the relatively simple question of whether Seattle would be required to live up to the terms of Article 49 and supply power to PUD—power that PUD intended to use to fulfill its obligations to its customers. Seattle's attempt to complain about the layout of the circuitry that would move power to Ponderay and, more specifically, to attack BPA's role in supplying a portion of that circuitry is not enough to confer jurisdiction upon FERC to review BPA's actions. If a rate issue eventually develops, that can be brought before FERC in a proper manner and in due course. Until then, Seattle will have to carry its fight to BPA and so on to this court if that becomes appropriate.[1]

## CONCLUSION

In the early 1960's Seattle won a major victory when it acquired the license to develop the Boundary Project. Heroic literature aside, most victories are not absolute and something is usually left for the vanquished. At the very least, the victory does not come without attendant costs.

---

1. Given this jurisdictional decision, we need not decide whether Seattle's challenge comes too late, as BPA asserts, or too early, as Puget

Sound asserts. The issue is not properly before us.

That was true here, and after years of dormancy the time has come to pay one of those costs. Neither FERC nor we can or should now determine that Seattle can escape from the obligations to PUD which were imposed when Seattle was awarded its laurel—the license.

Therefore, FERC was correct when it construed the license and ordered Seattle to deliver Boundary Project power to PUD at cost, which cost is to be on a demand-related basis as ultimately determined by FERC.

AFFIRMED.