FILED

NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

AUG 02 2011

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| GREENPEACE, INC.; CASCADIA WILDLANDS PROJECT,<br><br>    Plaintiffs - Appellants,<br><br> v.<br><br>FORREST COLE, Tongass National Forest Supervisor; BETH PENDLETON, Alaska Regional Forester; UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture,<br><br>    Defendants - Appellees. | No. 10-35567<br><br>D.C. No. 3:08-cv-00162-RRB<br><br>MEMORANDUM[*] |

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, Chief District Judge, Presiding

Argued and Submitted May 3, 2011
Anchorage, Alaska

Before: ALARCÓN, GRABER, and BYBEE, Circuit Judges.

Appellant-Plaintiffs Greenpeace, Inc., and Cascadia Wildlands Project

("Greenpeace") brought this Administrative Procedure Act challenge under the

_____

    [*]    This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

National Forest Management Act of 1976 ("NFMA") and the National

Environmental Policy Act of 1969 ("NEPA"), contesting the United States Forest

Service's ("USFS") approval of four timber logging projects in the Tongass

National Forest: Scott Peak, Overlook, Traitors Cove, and Soda Nick ("the

projects"). The district court granted summary judgment in favor of Defendants on

all claims raised before it.[1] We reverse in part, vacate in part, and remand.[2]

NFMA requires that National Forest System lands must be managed

"consistent with the land management plans." 16 U.S.C. § 1604(i); *Lands Council*

*v. McNair*, 537 F.3d 981, 989 (9th Cir. 2008) (en banc), *overruled in other part as*

*recognized by Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 &

n.10 (9th Cir. 2009). Although NFMA "does not specify precisely how the

[USFS] must demonstrate that it has met the objectives of the pertinent forest

plan," *Earth Island Inst. v. Carlton*, 626 F.3d 462, 470 (9th Cir. 2010) (internal

quotation marks omitted), at the least, USFS must "explain the conclusions it has

drawn from its chosen methodology, and the reasons it considers the underlying

---

[1] We review de novo the district court's resolution of cross-motions for summary judgment. *See Bader v. N. Line Layers, Inc.*, 503 F.3d 813, 816 (9th Cir. 2007).

[2] Because the parties are familiar with the facts, we recount them here only as necessary.

evidence to be reliable." *Id.* (internal quotation marks omitted). If USFS has explained itself adequately, "[w]e will conclude that the [USFS] acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *Id.* (internal quotation marks omitted); *see also Lands Council*, 537 F.3d at 987.

We do not think that USFS has adequately explained its decision to approve the four logging projects in the Tongass. The 1997 Tongass Land Managment Plan (the "TLMP") requires that USFS manage the Tongass so as "to maintain viable populations" of the Sitka black-tailed deer ("deer") and the Alexander Archipelago wolf ("wolf"), two local species identified as "management indicator species." *See* 1997 TLMP Table 6-1, 6-15 (Sitka black-tailed deer); 1997 TLMP WILD112.XI (Alexander Archipelago Wolf). Specifically, the TLMP requires USFS to "[p]rovide the abundance and distribution of habitat necessary to maintain viable populations of existing native and desirable introduced species well-distributed in the planning area." *Id.* at WILD112.II.B. The TLMP instructs USFS to do this by, among other things, "[p]rovid[ing] sufficient deer habitat capability to first maintain sustainable wolf populations, and then to consider meeting estimated human deer harvest demands." *Id.* at WILD112.XI.A.3.

3

We cannot follow the reasoning USFS used to approve the projects. USFS used a Deer Model to estimate how many deer could live on the land affected by the projects after the projects' conclusion. The Deer Model has two components at issue on appeal: (1) a habitat suitability index score ("HSI"); and (2) the Deer Multiplier, a constant representing "maximum long-term carrying capacity," *U.S. Dep't of Agric., Forest Serv., Tongass Land Management Plan Revision Final Environmental Impact Statement* at 3-367 (1997). Multiplied together, these numbers represent the "theoretical maximum number of deer that an area can support over the long term." *U.S. Dep't of Agric., Forest Serv., Scott Peak Final Environmental Impact Statement* at 3-45 (2005).

For reasons not entirely clear from the record, at different times, USFS used different HSI ranges—one with a maximum value of 1.0, and a second with a maximum value of 1.3. Similarly, USFS used different figures for its Deer Multiplier. It variously estimated the maximum carrying capacity of a square mile at 75, 100, and 125. Given the variations in the HSI and the Deer Multiplier, the maximum carrying capacity (HSX x Deer Multiplier) could have ranged from a low of 75 (1.0 x 75) to a high of 162 (1.3 x 125). Ultimately, USFS reduced the Deer Multiplier to 100 but maintained the maximum HSI at 1.3.

4

USFS has failed to explain how it ended up with a table that identifies 100 deer per square mile as a maximum carrying capacity, but allows 130 deer per square mile as a potential carrying capacity. "The agency is obligated to articulate a rational connection between the facts found and the choices made," which the agency has not done here. *Pac. Coast Fed'n of Fisherman's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005) (internal quotation marks and brackets omitted). Because deer are a management indicator species, the calculation or miscalculation of the logging areas' deer-carrying capacity affects all four projects. Accordingly, we reverse and remand on the NFMA claims.[3]

In light of the remand on the NFMA claims, it is premature to decide whether USFS met its NEPA obligations to discuss responsible opposing views

---

[3] We have similar questions about USFS's use of VolStrata data, which identifies total timber volume and not forest structure, to approve the projects, where forest structure—and not total timber volume—is relevant to the habitability of a piece of land. USFS itself has recognized the limitations in the VolStrata data. *See U.S. Department of Agriculture, Forest Service, Tongass Land and Resource Management Plan Draft Environmental Impact Statement Plan Amendment* at 3-113 (2007) ("Differences in forest structure are more useful because timber volume may be misleading when describing wildlife habitat."). Because we must remand to the agency to re-examine its Deer Model, we need not decide whether the use of the VolStrata data was arbitrary and capricious. We anticipate that, in reviewing the proposed projects, USFS will use the best available data and that it will either use a different data set or explain why the VolStrata data still represent the "best available science," as is required for at least the Traitors Cove and Soda Nick projects. *See* 36 C.F.R. § 219.35(a)(2000).

and to respond to comments in the Scott Peak and Traitors Cove environmental impact statements ("EIS"). *See* 40 C.F.R. § 1502.9(b), § 1503.4; *see also Nat'l Wildlife Fed'n v. FERC*, 801 F.2d 1505, 1515 (9th Cir. 1986) (declining to reach plaintiffs' NEPA claims because they may become moot subsequent to agency action taken upon remand).[4] We expect that, on remand, USFS will determine whether its new Deer Model analyses require it to supplement its NEPA documents. *See* 40 C.F.R. § 1502.9(c)(1) (An agency "[s]hall prepare supplements to . . . [EISs] if: (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on

---

[4] Greenpeace's opposing viewpoint and comments claims are brought under 40 C.F.R. § 1502.9(b) and § 1503.4, which govern EISs and not environmental assessments ("EAs"). Because USFS completed EAs—and not EISs—for the Overlook and Soda Nick projects, USFS is not under an obligation to comply with § 1502.9(b) and § 1503.4 for those projects. Greenpeace alleges that 40 C.F.R. § 1508.27(b)(4) imposes requirements for EAs similar to those for EISs in § 1502.9(b) and § 1503.4 by requiring USFS to consider in an EA "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." But none of the cases cited by Greenpeace stands for the proposition that § 1508.27(b)(4) is to EAs what § 1502.9(b) and § 1503.4 are to EISs; rather, they discuss whether the defendant agencies erred in not preparing EISs. *See Anderson v. Evans*, 371 F.3d 475, 489 (9th Cir. 2004); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998); *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992). Because the issue of whether USFS should have prepared EISs for the Overlook and Soda Nick projects in lieu of or in addition to EAs is not before us on appeal, Greenpeace's cited cases are inapposite, and we do not address § 1508.27(b)(4).

6

the proposed action or its impacts.").  We further expect that USFS will "discuss . . . in the final statement any responsible opposing view," *id*. § 1502.9(b), and will "make available to the public high quality information, including accurate scientific analysis, expert agency comments and public scrutiny, before decisions are made and actions are taken," *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 492 (9th Cir. 2011) (internal quotation marks omitted).  Accordingly, we vacate the district court's judgment on the NEPA claims.

We reverse in part, vacate in part, and remand to the district court with instructions to remand to the agency for further action.

REVERSED IN PART, VACATED IN PART, AND REMANDED.