Harriet F. LaFLAMME, Petitioner,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

Joseph Keating *,
Respondent–Intervenor.

No. 85–7571.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 2, 1986.

Decided March 18, 1988.

Order and Amended Opinion Filed
July 5, 1988.

* On January 25, 1988, by order of this court, Sayles Hydro Associates was substituted as respondent-intervenor for Joseph Keating pursuant to FRAP 43(b).

Glenn M. Kottcamp, Fresno, Cal., for petitioner.

John N. Estes III, Federal Energy Regulatory Com'n, Office of Gen. Counsel, Washington, D.C., for respondent.

Stuart L. Somach, McDonough, Holland & Allen, Sacramento, Cal., for respondent-intervenor.

Before SCHROEDER, NORRIS and BRUNETTI, Circuit Judges.

## ORDER

In *LaFlamme v. FERC*, 842 F.2d 1063 (9th Cir.1988) we vacated FERC's order

issuing a license to Joseph M. Keating for Sayles Flat Project No. 3195 for the construction, operation and maintenance of a diversion dam, reservoir intake, 4,000 foot steel pen stock, power house and generating units, transformer transmission line and appurtenant facilities. We vacated the license because of the Federal Energy Regulatory Commission's (FERC) failure to comply with the requirements of the Federal Power Act (FPA), the National Environmental Policy Act (NEPA), and all applicable regulations regarding the Sayles Flat Project's recreational use and visual quality, cumulative impact and need for a comprehensive plan.

Intervenor has now filed a petition for rehearing requesting that we modify our opinion and not vacate the license pending completion of the required analysis by FERC on remand, thereby allowing operation of the Sayles Flat Hydroelectric Plant during the remand. Intervenor states that the Sayles Flat Project is substantially complete and that prohibition on operation will cause irreparable harm to intervenor and, finally, that the operation will not interfere with FERC's decision making or result in harm to the environment.

■ FERC responded to the petition for rehearing stating that under certain conditions it had no objection to allowing the intervenor to operate the Project while FERC is conducting proceedings on remand pursuant to our opinion. However, FERC noted that the court must somehow alter its opinion so that the license remains intact on remand, if not, the Project operators would be in violation of § 23b of the Federal Power Act, 16 U.S.C. § 817 (1982). FERC also asserts that if the court simply preserves the original license, the Commission could arguably find itself bound by the terms and conditions presently in the license and, therefore, without sufficient authority to fulfill our mandate by protecting the environment with appropriate interim measures.

We also note that after the matter was submitted FERC, on October 20, 1987, issued an order approving a pre-project recreation use and visual quality study, and in that order has apparently increased and possibly doubled proposed minimum water flows to be released during the operation of the Project. FERC has amended the Sayles Flat Project license to establish those increased flow releases; to require the filing with FERC of a plan and schedule determining a ramping rate (the maximum rate of change in river flow due to project operation); and to establish a maximum pool elevation. We also note that on July 23, 1986, FERC prepared a cumulative impact study entitled "Environmental Assessment of Potential Cumulative Impacts Associated with Hydropower Development in the South Fork of the American (SO-FAR) Basin, California" (EA), with regard to five other hydroelectric projects in the same basin where the Sayles Flat Project is located. While the July 23, 1986 EA specifically discussed the proposed hydropower projects for Pyramid Creek, Foot Trail, Upper Rock Creek, Frye Creek and Twenty-Nine Mile Creek, it also made limited reference to the Sayles Flat Project but did not make the required analysis with regard to Sayles Flat as required by our opinion.

In its order of August 23, 1985, denying LaFlamme a rehearing, FERC amended the Sayles Flat license adding Article 44 requiring a "recreation use-visual quality study". We make no findings as to whether FERC's order approving the Pre–Project Recreational Use and Visual Quality Study or the July 23, 1986, EA satisfy the requirements of our remand. Neither documents were considered on August 23, 1985, when FERC entered an order rejecting all of LaFlamme's arguments and denied her petition for rehearing, nor were they in existence when the license was issued to Keating. In accordance with the reasoning in our opinion this subsequent documentation may be considered by FERC on remand with regard to the requirements of NEPA and FPA.

Intervenor states that because the Federal Power Act, 16 U.S.C. § 806, requires the licensee to commence construction within two years of the date of the issuance of the license, he was faced with the necessity of going forward with the construction of the

Project to meet the deadlines of the Federal Power Act. Relying on *Forelaws on Board v. Johnson*, 743 F.2d 677 (9th Cir. 1984), intervenor asserts that the power project is completed and we should not vacate the license. In *Forelaws* the Bonneville Power Administration (BPA) argued that it did not prepare an Environmental Impact Statement (EIS) prior to offering long term contracts for power delivery pursuant to the Pacific Northwest Electric Power Planning & Conservation Act (Regional Act), 16 U.S.C. § 839–39h (1982), because Congress had mandated that within 21 months of the Act's effective date, a new system of contracts allocating BPA's supply of hydropower was to be in place. BPA argued that the statutory deadlines for contract offer and acceptance made it impossible to prepare an EIS. We found, in fact, that the statute did not mandate the schedule which BPA followed and we refused to enjoin the contracts pending the completion of the EIS. *Forelaws* is clearly distinguishable because of "clear tension between NEPA's charge to the agency to evaluate the effects of action upon the environment and the command of the Regional Act that the contracts be in place within 21 months of its passage." *Forelaws*, 743 F.2d at 686. Such statutory conflict does not exist between NEPA and the Federal Power Act under which the Sayles Flat Project was issued a license.

Here FERC issued its license on September 26, 1983, and in that license specified that Keating must commence construction of the Project within two years of the issuance date of the license, i.e., September 26, 1985, and prosecute and complete the construction within four years of the effective date of the license, i.e., September 1, 1987. The FPA, however, allows the commencement of construction to be extended once but not longer than two additional years and, in fact, intervenor's petition for rehearing indicates that FERC extended the time to September 25, 1987. Intervenor was aware of the pending litigation at the time he commenced construction in September 1986. According to the time lines set forth in the Federal Power Act, 16 U.S.C. § 806, an additional two years could have extended the commencement of construction to September 26, 1987, and the completion date extended to September 1, 1989. Further, the FPA did not require FERC to issue the license on any particular date and certainly not before the requirements under FPA and NEPA were met. This case is totally unlike *Forelaws* wherein the Regional Act required the BPA to act within 21 months of the Act's effective date. Here FERC did not fail to prepare an EIS or a Finding of No Significant Impact (FONSI) or comply with FPA or NEPA because of a time limit on the issuance of the Sayles Flat license. The two year requirement on Keating to commence construction after the license was issued has no relationship to FERC's obligations to comply with NEPA and FPA prior to the issuance of the license.

Intervenor claims irreparable harm will be suffered to intervenor if the license is vacated citing the possibilities of a default being declared by a financing bank, bankruptcy of Sayles Hydro Associates, default on personal guaranties, and nonpayments to creditors. The record is not clear that even if the license remains in effect that the Project would be capable of producing power to produce the revenues required to avert what intervenor claims to be financial irreparable harm. Intervenor's petition for rehearing admits the Project is substantially complete but there must be an intertie with Pacific Gas & Electric (PG & E), the power purchaser, and "some minor work" required by the United States Forest Service in accordance with their memorandum of understanding to complete the project. Petitioner, LaFlamme, in her memorandum in opposition to the petition for rehearing, indicates that the Forest Service had suspended the special use permit for the Project over one year ago and that the intervenor does not explain how it would get the special use permit reinstated with or without the FERC license. This assertion is unsupported but raises the question with the other uncompleted conditions as to whether the Project can operate with a license. LaFlamme also states that intervenor does not provide a projection of in-

come in "this low water year of 1988" to demonstrate a schedule of payments to satisfy its creditors if the license is allowed to be kept in force and the Project operate during the remand. LaFlamme further raises issues that the FERC license does not preempt state water rights, particularly regulation of bypass releases, an issue that is allegedly presently before this court in *California v. FERC*, No. 87–7538. FERC acknowledged this problem at page 10 of its August 23, 1985, order denying LaFlamme's petition for rehearing.

In order for the Project to become operational this year the intervenor has stated it is essential that all agreements with PG & E resolving the intertie issues must be completed; and that possibly the Project must be refinanced. (Steven V. Strasser Declaration to Intervenor's Petition for Rehearing, paras. 13, 14 and 17).

We find no evidence in the record before us that the continuance of the license to allow operation of the Project will prevent irreparable financial harm, as the conditions mentioned above must be satisfied before the Project can operate whether or not the license is in effect. Until those matters can be resolved by the appropriate agencies or authorities intervenor has not shown that the withholding of the license is the cause of the alleged irreparable financial harm, if any. Intervenor's bare allegations of financial harm are insufficient to establish irreparable harm and intervenor has failed to show that this is an unusual case such that we must clarify our decision to permit operation of the hydropower project. See *Steamboaters v. FERC*, 777 F.2d 1384, 1386 (9th Cir.1985).

We note that the Sayles Flat Hydroelectric Plant is alleged to be substantially complete, that prior stays of the FERC license have been denied, and that intervenor may have commenced construction sooner than necessary but with full knowledge of the present action. These circumstances do not justify the avoidance of the requirements of the FPA and NEPA as expressed in our opinion, or allow operation of the Sayles Flat Hydroelectric Plant during remand. However, considering the substantial completion of the Project, the consideration by FERC of the pre-project recreation use-visual quality study, and the collateral consideration by FERC in the EA of July 23, 1986, to the Sayles Flat Project there seems to be commencement of compliance with NEPA as required by our opinion. Therefore, we amend the remedy as expressed in the opinion and Section III, Remedy, at 842 F.2d at 1074 is deleted in its entirety and a new Section III, Remedy, is added as follows:

I. *Remedy*

The license for the Sayles Flat Project as issued by FERC on September 26, 1983, and as amended is suspended and FERC's order denying LaFlamme's petition for rehearing is set aside. The matter is remanded to FERC for further consideration of the issues raised by petitioner LaFlamme concerning the Sayles Flat Project recreational use and visual quality, cumulative impact and need for a comprehensive plan. FERC shall consider the requirements of the Federal Power Act, the National Environmental Policy Act and all applicable regulations, and FERC shall not reinstate the license for the Sayles Flat Project or allow its operation until such time as the issues concerning the Project, recreation use and visual quality, cumulative impact and need for a comprehensive plan have been satisfied consistent with this opinion. The license suspension will have the status as a license subject to rehearing before FERC in accordance with 16 U.S.C. § 825(*l*).

This panel retains jurisdiction over any further proceedings related to this matter which are filed in this court.

LICENSE SUSPENDED and REMANDED.

Additionally, petitioner's motion to lodge additional record is DENIED.

AMENDED OPINION

BRUNETTI, Circuit Judge:

Harriet LaFlamme has petitioned for review of two orders issued by the Federal Energy Regulatory Commission ("FERC"), (1) an order filed September 26, 1983 granting Joseph Keating a license to construct

and operate a hydroelectric power project on the South Fork of the American River, and (2) an order filed August 23, 1985 denying her petition for a rehearing. We conclude that the order denying LaFlamme's petition for rehearing must be set aside, the order granting a license vacated, and this matter remanded to FERC for further consideration.

## I. *Facts and Proceedings Below*

On May 27, 1980, Joseph Keating filed an application for a preliminary permit for a power project. FERC issued the permit on December 11, 1980. Thereafter, Keating consulted with federal, state, and local agencies, who provided their comments on the license proposal. On April 29, 1982, Keating filed an "Application for License for a Major Water Power Project" to be built on the South Fork of the American River ("the River") in an area called Sayles Flat, in El Dorado County, California.

The proposed project consists of: (1) a 130–foot-long, 8.4–foot-high diversion structure with a Bascule gate; (2) a 2.3–acre reservoir with 6 acre-feet of usable capacity; (3) an intake structure; (4) a 4,000–foot-long, 42–inch-diameter steel penstock; (5) a powerhouse containing two generating units, one unit rated at 950 kW and one mobile unit rated at 2000 kW; (6) a 1,200–foot-long transmission line; and (7) appurtenant facilities.

On June 16, 1982, FERC directly mailed notice of the license application to state and federal agencies and published notice of the application in the *Mountain Democrat and Times* on July 9, 16, 23, and 30, 1982. FERC requested the agencies' comments on the application, pursuant to the applicable statutes, including the National Environmental Policy Act, 42 U.S.C. § 4332

(1982) ("NEPA") and the Federal Power Act, 16 U.S.C. § 791a *et seq.* ("FPA").

None of the responding federal agencies objected to the license or recommended any special conditions. Similarly, state agencies were generally in accord with the federal agencies, although there were some disagreements and suggested changes with regard to minimum flow releases in the river. However, the public response was overwhelmingly negative. Complaints included water purification problems resulting from wiping out the river's four cascades, death of vegetation and wildlife due to inadequate minimum streamflows, and the loss of 4200 feet of rushing water with its opportunities for recreational and aesthetic pleasure.

On January 17, 1983, Harriet LaFlamme petitioned FERC to intervene in this license application proceeding. On March 9 of that year, FERC granted LaFlamme's motion. On September 26, 1983, FERC granted the project license to Keating. In the order issuing the license, FERC addressed most of the concerns raised by LaFlamme and the agencies during the application period: economic feasibility and need for power; recreation; cultural resources; water quality; aquatic and terrestrial resources; streamflow measurement; modification of project facilities and operation; minimum flows; environmental impacts; headwater benefits project coordination; other aspects of comprehensive development; and the need for a public hearing. FERC's discussion of each of these concerns varied, ranging from perfunctory to in-depth analysis. FERC concluded that the project would be "best adapted to a plan for the comprehensive development of the river basin for beneficial uses upon compliance with the terms and conditions of the license" and therefore complied with the Federal Power Act.[1] Additionally, FERC concluded "that

---

**1.** The Federal Power Act, 16 U.S.C. § 803(a) (amended 1986), requires that the following condition be imposed on licenses issued:

That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for

the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes; and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval.

the issuance of a license for the project will not constitute a major Federal action significantly affecting the quality of the human environment," and therefore compliance with NEPA [2] did not require promulgation of an environmental impact statement.

On October 24, 1983, LaFlamme petitioned FERC for a rehearing of Keating's license approval. LaFlamme objected to approval of Keating's license application on the following general grounds: no comprehensive plan for development of the American River Basin; no cumulative impact study; no consideration of the project's impact on scenic and aesthetic resources; inadequate assessment of environmental impact; inadequate mitigation measures; faulty analysis of economic feasibility and need for power; inadequate assessment and accommodation made for recreational resources; inadequate examination of cultural resources; and inadequate assessment of project's impact on water quality.

On August 28, 1984, Keating entered into a memorandum of agreement with the United States Forest Service which sought, among other things, "to define the respective responsibilities of Keating and of the Forest Service with respect to public utilization of project waters and adjacent lands for recreational purposes [and] protection of scenic resources...." Keating and the Forest Service agreed to conduct a two season recreation study, focusing on riparian vegetation, recreational use, and aesthetics in the project area. This study was intended to serve as the basis for modifying instream flow releases for purposes other than fishery protection.

On August 23, 1985, FERC entered an order rejecting all of LaFlamme's argu-

ments and denied her petition for rehearing. FERC affirmed their finding that the project was needed, economically feasible, and would not adversely impact cultural, aquatic or terrestrial resources.

Additionally, in this order, FERC discussed the project's site-specific impacts on what they considered to be the most important and most severely affected resource: the *recreational use and visual quality* of the project area. Previously, FERC had incorporated into the license, verbatim, six measures Keating suggested would adequately mitigate the project's impact on recreational use and visual quality: (1) develop a 0.5-mile-long hiking trail along the proposed penstock alignment—the penstock river crossing would also incorporate into the design a footbridge, an integral part of the trail; (2) maintain the proposed reservoir shoreline to abate erosion already occurring along the river; (3) develop a beach area on the south shoreline of the reservoir, with three picnic tables and barbeque pits; (4) develop a footbridge across the proposed impoundment to provide access to the camp; (5) provide vegetative screenings where appropriate; and (6) rehabilitate and preserve a portion of the Old Placerville Road/Stagecoach Trail to include a rustic-designed bridge across the river. While noting the recreational-type cabin developments in the project area and the Camp Sacramento recreational facility immediately adjacent to the proposed facility, FERC concluded that these six proposed mitigation measures "would provide for the public recreation needs of the project in the immediate future." This conclusion was based on the FERC's staff's December 29, 1982 report, entitled "Environmental Evaluation Report on FERC Project No. 3195–

---

**2.** The National Environmental Policy Act, 42 U.S.C. § 4332(2)(C), (NEPA), provides:

The Congress authorizes and directs that, to the fullest extent possible: ... (2) all agencies of Federal Government shall— ...

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible officials on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

003" (Keating's Project number), and on the August 28, 1984 memorandum of agreement between Keating and the Forest Service. However, nowhere in these documents or in Keating's application was any recreational use data reported for the immediate project area. As a result, FERC's conclusions regarding the recreational use and visual quality of the project area were based upon FERC staff's analysis of data pertaining to the Echo Lake Development, which is located three miles from Keating's project.

In their order denying LaFlamme's petition for rehearing, FERC did not dispute LaFlamme's assertion that the project would have an impact on recreational use and aesthetic quality in the project area. They discussed the memorandum of agreement entered into between Keating and the Forest Service on August 28, 1984, and agreed that the project warranted a post-licensing two recreation season study as decided upon by Keating and the Forest Service.

Accordingly, in its order denying the petition for rehearing, FERC added a new condition to the Sayles Flat project license, contained in Article 44. Article 44 provides as follows:

> *Article 44.* The Licensee shall, in consultation with the U.S. Forest Service, conduct a recreation use-visual quality study. The study shall address, among other things: locations of recreation use areas; existing recreation use types, patterns, and amounts; the value of recreation uses and significance of sites; the potential impacts of the project on recreation; and alternative recreation options and mitigation measures. The study shall also examine the relationship of visual aesthetics to streamflows and recreation uses and the feasibility and impacts of establishing different day-time and night-time instream flows to protect and enhance recreation use and visual quality at the project site during the peak recreation season (Memorial Day to Labor Day). The study shall be conducted over a two-peak recreation-season period, and a report embodying the results of the study, together with recommendations

regarding different day-time and night-time instream flows, shall be filed with the Commission within 90 days after the expiration of the second peak recreation season. In carrying out this study, the Licensee may incorporate the procedures and results of any similar study it is undertaking pursuant to any memorandum of agreement it has entered into with the U.S. Forest Service. The Commission reserves the right to order reasonable modifications in instream flow releases to ensure the protection and enhancement of recreation use and visual quality at the project site.

By incorporating this article into the license, FERC addressed, for the first time, critical aspects of the project area's recreational use and visual quality: the locations of recreation use areas; existing recreation use types, patterns and amounts; the values of the uses and significance of sites; the potential impacts on recreation due to the project; and the relationship between visual quality to stream flows and recreation uses.

FERC rejected LaFlamme's request for an environmental impact statement (EIS) on the project's site-specific impacts, concluding that the project was not a major federal action significantly affecting the quality of the human environment, and rejected LaFlamme's contention that an EIS analyzing the cumulative impact of the power projects in the American River Basin was necessary. FERC asserted that the project's cumulative impact had been studied by the FERC staff in the May 31, 1984 report entitled "Preliminary Environmental Review, South Fork American River Basin, California." In discussing target resources, this report states that "the most severe impacts of the Sayles Flat Project would be on recreational resources and visual quality in the bypassed reach as a result of the reduction in streamflow" caused by a diversion dam. Accordingly, FERC stated that the two-year recreational study, agreed upon by Keating and the Forest Service, "is warranted to determine whether additional flow releases above that required in Article 38 of the license would

lessen the impact of the proposed project on recreational use and visual quality in the bypassed reach during peak recreation season." Considering that such a study is now required by license Article 44, FERC concluded that Keating's project would not have a potential for significant adverse cumulative impacts on target resources of the area, thereby negating the need for a cumulative impact EIS.

Finally, FERC's denial order rejected LaFlamme's argument that the failure to develop "a comprehensive plan" for the development of the American River violated the FPA. FERC claimed that because they considered all issues relevant to the public interest, they had complied with the FPA.

## II. *Analysis*

### A. Jurisdiction

The scope of our jurisdiction is controlled by 16 U.S.C. § 825*l* (b) (1982),[3] which permits this court to consider any objection to an order entered by FERC which has been raised in the petitioner's application for rehearing. LaFlamme's petition for rehearing raised objections to FERC's assessment of site-specific impacts, including the economic feasibility and need for power, recreational resources, cultural resources, and aquatic and terrestrial resources, as well as cumulative impacts. Additionally, LaFlamme's petition argues that the FPA required FERC to prepare a comprehensive plan for the development of the American River.

### B. The National Environmental Protection Act (NEPA)

LaFlamme contends that construction of the Sayles Flat project is "a major federal action significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), and thereby necessitates the preparation of an EIS before the project can be licensed. According to LaFlamme, FERC's decision to license this project without first preparing an EIS violates NEPA.

■ In this circuit, "an EIS must be prepared if 'substantial questions are raised as to whether a project ... *may* cause significant degradation of some human environmental factor.'" *City and County of San Francisco v. United States*, 615 F.2d 498, 500 (9th Cir.1980) (emphasis in original) (quoting *City of Davis v. Coleman*, 521 F.2d 661, 673 (9th Cir.1975) (quoting *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 467 (5th Cir.1973)). The plaintiff need not show that significant effects *will in fact occur*, but if the plaintiff raises substantial questions whether a project may have a significant effect, an EIS *must* be prepared. *Foundation For North American Wild Sheep v. United States Department of Agriculture*, 681 F.2d 1172, 1178 (9th Cir.1982).

■ We review an agency determination not to file an EIS by considering whether the responsible agency has "reasonably concluded" that the project will have no significant adverse environmental consequences. *City and County of San Fran-*

---

**3.** 16 U.S.C. § 825*l* (b) provides:

         (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States Court of Appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member

of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of Title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is a reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. . . .

*cisco v. United States*, 615 F.2d at 500. We will defer to an agency's judgment, and not substitute our own, only when the agency's judgment is "fully informed and well-considered." *Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir.1986).

A brief consideration of the scope and purpose of NEPA will illuminate our discussion of whether FERC reasonably concluded that no substantial questions were raised as to whether the Sayles Flat project might cause a significant environmental effect. This circuit has interpreted the congressional mandate, to apply NEPA "to the fullest extent possible," 42 U.S.C. § 4332, as a direction to "make as liberal an interpretation as we can to accommodate the application of NEPA." *Jones v. Gordon*, 792 F.2d at 826. One of NEPA's goals is to facilitate "widespread discussion and consideration of the environmental risks and remedies associated with the pending project," thereby augmenting an informed decisionmaking process. *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1021 (9th Cir.1980) (per curiam). NEPA requires that this evaluation take place *be-*

*fore* a project is approved. 40 C.F.R. §§ 1500.1(a), 1501.1, 1502.5 (1987); *see Andrus v. Sierra Club*, 442 U.S. 347, 351, 99 S.Ct. 2335, 2337, 60 L.Ed.2d 943 (1979). As part of this process, environmental factors must be considered on an equal basis with other, more traditional, concerns. *Foundation for North American Wild Sheep v. United States Department of Agriculture*, 681 F.2d at 1177. With this approach to decisionmaking, agencies will take the necessary "hard look" at environmental consequences before approving any major federal action. *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976).

FERC's stated policy and regulations require compliance with NEPA when acting under Part I of the FPA. 18 C.F.R. §§ 2.80(a) and (b) (1987). After FERC makes an initial review of the applicant's environmental report, FERC determines whether the proposed project is "a major Federal action significantly affecting the quality of the human environment." [4] 18 C.F.R. § 2.81(b) (1987). If so, FERC must prepare an EIS. *Id.* If not, FERC must

---

**4.** 40 C.F.R. § 1508.27 (1987) provides:

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

prepare a Finding of No Significant Impact (FONSI). 40 C.F.R. §§ 1501.4(e), 1508.13 (1987).

Relying on the staff reports of December 29, 1982 and May 31, 1984 reports, FERC concluded that issuing a license for the Sayles Flat Project would not constitute a major Federal action significantly affecting the quality of the human environment. However, we conclude that LaFlamme raised substantial questions regarding whether the Sayles Flat project might cause significant environmental degradation due to both its site-specific impact on recreational use and visual quality and its cumulative impact with other projects in the area. These questions were not adequately addressed by FERC. In fact, the area's recreational use and visual quality, as well as the project's impact thereon, had not been specifically identified prior to licensing the project. Furthermore, we conclude that FERC failed to specifically explain *how* the license conditions will mitigate these adverse environmental consequences. Therefore, on this record, we conclude that FERC's decision not to prepare an EIS was not reasonable.

### 1. Site–Specific Impacts

In the rehearing denial order, FERC's discussion of the economic feasibility and need for the power, cultural resources, and aquatic and terrestrial resources provides a clear statement of reasons why these factors are insignificant. FERC's analysis compels our conclusion that they took the required "hard look" at the potential environmental impacts in these three areas.

■ However, we cannot reach the same conclusion after examining FERC's assessment of the project's impact on recreational resources and visual quality. At the outset, we note that FERC neglected to prepare either an environmental assessment (EA) or a FONSI, as required by 40 C.F.R. § 1501.4 (1987), thereby violating the required NEPA procedure. The only environmental analysis performed was the two FERC staff reports of December 29, 1982 and May 31, 1984, filed after the license was issued, after the petition for rehearing

was filed, and just one week before the petition for rehearing was denied. Thus, the basis for FERC's conclusion that the project will not significantly affect the quality of the human environment, and therefore not require preparation of an EIS, can only be ascertained by reviewing the voluminous agency record. This kind of speculation regarding the basis for an agency's decision not to prepare an EIS is precisely what NEPA was intended to prevent. *See The Steamboaters v. F.E.R.C.,* 759 F.2d 1382, 1393 (9th Cir.1985). NEPA is an "essentially procedural" statute, *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978), and "[w]e enforce NEPA under our authority to 'hold unlawful and set aside agency action, findings, and conclusions found to be ... without observance of procedure required by law.'" *City of Angoon v. Hodel,* 803 F.2d 1016, 1020 (9th Cir.1986) (quoting *Lathan v. Brinegar,* 506 F.2d 677, 692–93 (9th Cir. 1974) (en banc)); Administrative Procedure Act, 5 U.S.C. § 706(2)(D). FERC's failure to follow required NEPA procedure violates the law and provides a sufficient basis for reversing their decision.

■ In addition to this technical violation of NEPA, FERC's substantive evaluation of the project's impact on recreational use and visual quality also violates NEPA. Although FERC identified recreational use and visual quality as the most important and most severely affected resource in the project area, their conclusion that the license conditions will adequately mitigate the project's impact on this resource, to the point of "insignificance," is simply not supportable on the record. An "agency must supply a convincing statement of reasons why potential effects are insignificant." *The Steamboaters v. F.E.R.C.,* 759 F.2d at 1393. While it is true that mitigation measures can justify an agency's conclusion that a project's impact is not significant, an agency must explain exactly how the measures will mitigate the project's impact. *Id.* at 1394; *Jones v. Gordon,* 792 F.2d at 829. At no point does FERC attempt

to *explain* exactly how Keating's six proposed mitigation measures will reduce the significance of the project's impact on recreational use and visual quality. Indeed, at this point, any such explanation could only represent speculation in any case, considering that the existing, specific recreation use and visual quality of this area have yet to be determined by the post-licensing, two recreation season study. Additionally, FERC's verbatim adoption of Keating's proposed mitigation measures and the Forest Service–Keating two recreation season study, without any *analysis* of how these measures would diminish the project's impact, violated FERC's duty to *independently* assess the consequences of a project. *Southern Oregon Citizens Against Toxic Sprays, Inc. v. Clark,* 720 F.2d 1475, 1480 (9th Cir.1983), *cert. denied,* 469 U.S. 1028, 105 S.Ct. 446, 83 L.Ed.2d 372 (1984).

As in *The Steamboaters,* FERC's omission is particularly troubling because of the serious questions raised by LaFlamme regarding the impact of this project. LaFlamme's concerns regarding the loss of the sight and sound of over 4000 feet of cascading water, as well as the ponds, pools, waterfalls and streamlets created by this vigorously moving river, and the resulting loss of the aesthetic quality and recreational opportunities such a river creates, were neither specifically addressed, nor adequately mitigated, due to the lack of any discussion of *how* these measures would lessen the project's impact.

■ FERC's reliance on a post-licensing, two season recreation study as an adequate mitigation measure is also misplaced. First, NEPA clearly requires that consideration of the environmental impacts of proposed projects take place *before* any licensing decision is made. "[T]he very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for speculation by insuring that available data is gathered and analyzed prior to the implementation of the proposed action." *Foundation for North American Wild Sheep v. United States Department*

*of Agriculture,* 681 F.2d at 1179. After all, once a project begins, the "pre-project environment" becomes a thing of the past. Evaluating the project's effect on pre-project resources is simply impossible.

Although FERC labels this post-licensing study as merely a means for "fine-tuning" the previously imposed mitigation measures, the scope of this study is so comprehensive that FERC in essence will be considering the project's impact on specific aspects of recreational use and visual quality for the first time. In fact, as recognized in the December 29, 1982 report, Keating never submitted recreational use data for the Sayles Flat area. FERC relied solely on data gathered at the Echo Lake Development when they determined that Keating's six proposed mitigation measures would reduce any impact from the project on recreation to the point of "insignificance." This type of post-licensing data gathering violates NEPA's very letter and purpose.

Additionally, reliance on a post-licensing study to fully develop a mitigation plan deprives FERC of any foundation upon which to base their conclusion that the project's impact on recreational use and visual quality will not be significant. "We fail to see how mitigation measures can be properly analyzed and their effectiveness explained when they have yet to be fully developed." *Oregon Natural Resources Council v. Marsh,* 832 F.2d 1489, 1493 (9th Cir.1987).

■ Finally, the controversy created by this project supports our conclusion that substantial questions were raised regarding whether this project may significantly degrade some aspect of the human environment. "[T]he degree to which the effects on the quality of the human environment are likely to be highly controversial" is one factor in determining how "significantly" a proposed action affects the quality of the environment. 40 C.F.R. § 1508.27(b)(4) (1987). In *Foundation for North American Wild Sheep,* this court stated that "the term 'controversial' refers 'to cases where a substantial dispute exists as to the size,

nature, or *effect* of the major federal action rather than to the existence of opposition to a use.'" 681 F.2d at 1182 (quoting *Rucker v. Willis*, 484 F.2d 158, 162 (4th Cir.1973)). In that case, "the numerous responses from conservationists, biologists, and other knowledgeable individuals, all ... disputing the EA's conclusions [regarding the likely effect of] reopening [the road]," led this court to conclude that "this is precisely the type of 'controversial' action for which an EIS must be prepared." *Id.*

Similarly, LaFlamme's dispute with FERC centers around the effect the dam will have on recreational use and visual quality in the project area, as well as the effect the proposed mitigation measures will have on preventing significant degradation of the quality of the environment. While FERC disputes LaFlamme's contentions, "nowhere [does FERC explain] why [LaFlamme's] points do not suffice to create a public controversy based on potential environmental consequences." *Jones v. Gordon*, 792 F.2d at 829. NEPA requires such a well-reasoned explanation.

We conclude that there were substantial questions raised regarding whether the project may significantly affect recreational use and visual quality in the project area, and that FERC failed to explain or discuss how the proposed mitigation measures lessen the project's impact on these resources to the point of insignificance. Therefore, because this record reflects a decision which is neither "fully informed or well-considered, we conclude that FERC's decision not to prepare an EIS was unreasonable.

### 2. *Cumulative Impacts*

■ In *National Wildlife Federation v. F.E.R.C.*, 801 F.2d 1505, 1507 (9th Cir. 1986), FERC conceded that the Federal Power Act requires consideration of cumulative impacts before licenses are issued. NEPA also requires consideration of cumulative impacts when determining whether an action significantly affects the quality of the human environment. Title 40 of the Code of Federal Regulations, Section 1508.7 provides:

"Cumulative impact" is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

FERC contends that it reviewed the cumulative environmental impact of the projects proposed to be developed in the American River basin in the May 31, 1984 staff report and concluded that the Sayles Flat and other projects would not have a potential for causing significant adverse cumulative impacts on the resources in that area. Therefore, FERC argues that no cumulative impacts EIS is necessary for this project.

The May 31, 1984 FERC staff report reviews pending license applications, applications for exemption, and licenses under appeal, including Sayles Flat. The report relies on the EIS previously prepared for one of these projects, the Upper Mountain Project, as an adequate evaluation of the cumulative impact of *all* the proposed projects in this area.

The Upper Mountain Project EIS is limited to assessing the impact of that project's diversion dams and other proposed facilities in that project's area. At no point did the EIS analyze the effects other projects, pending or otherwise, might have on this section of the American River Basin. Such a narrow analysis of one project's impact on this area cannot possibly provide the necessary broad consideration of all "past, present and reasonably foreseeable future actions" required in a cumulative impact analysis. Considering that the Upper Mountain Project represents only the initial development of the remaining water resources in the South Fork of the American River basin, the foreseeability of future development underscores the importance of

performing a comprehensive cumulative impact analysis of the project's effects on the environment before any more development proceeds. The Upper Mountain Project's EIS does not provide the necessary comprehensive analysis of the cumulative impact of all projects in this area, especially the Sayles Flat Project.

Additionally, FERC's analysis of the Sayles Flat project in their order denying rehearing does not support their conclusion that this project does not have a potential for significant adverse cumulative impacts on the resources in this area. FERC and the FERC staff make the same analytical error with Sayles Flat as they did in their study of the Upper Mountain Project: they examined the Sayles Flat project *in isolation,* without considering the "net" impact that all projects in the area may have on the environment. *National Wildlife Federation v. FERC,* 801 F.2d at 1507. Therefore, because FERC has not considered the impact that *all* past, present, and reasonably foreseeable future projects may have on the basin's resources, the record simply cannot support FERC's conclusion that the Sayles Flat project does not have a potential for adverse cumulative impacts on the environment. Accordingly, FERC's decision not to prepare an EIS on the project's cumulative impacts was unreasonable.

## C. The Federal Power Act

■ LaFlamme contends that by granting this license, FERC violated 16 U.S.C. § 803(a) (amended 1986), which requires that projects be "best adapted to a comprehensive plan for improving or developing a waterway ... for other beneficial public uses, including recreational purposes...."

The statute's requirement of a comprehensive plan underscores "Congress' commitment to coordinated study and comprehensive planning along an entire river system before hydroelectric projects are authorized." *National Wildlife Federation v. F.E.R.C.,* 801 F.2d at 1507. "Each particular dam project should be given consideration not only with a view to the locality where constructed but with reference to the entire water system of which it constituted a part." *Id.*

FERC argues that it satisfied this requirement of developing a comprehensive plan by examining in its order denying LaFlamme's petition for rehearing, the need for *this* project, its economic feasibility, its fishery, visual, recreational, and other environmental impacts, and its impact on cultural resources.

We "must conduct a 'searching and careful' inquiry into the record in order to assure [ourselves] that the agency has examined the relevant data and articulated a reasoned explanation for its action including a 'rational connection between the facts found and the choice made.' " *Id.* at 1512, n. 16 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). FERC has an affirmative duty to develop a complete record, inquiring into and considering all relevant facts. *Confederated Tribes and Bands of The Yakima Indian Nation v. F.E.R.C.,* 746 F.2d 466, 472 (9th Cir.1984), *cert. denied,* 471 U.S. 1116, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985). Therefore, because FERC may only grant licenses which are in "the public interest," the record must establish that FERC has explored all issues relevant to the public interest, including "future power demand and supply, alternative sources of power, the public interest in preserving reaches of wild rivers and wilderness areas, the preservation of anadromous fish for commercial and recreational purposes, and the protection of wildlife." *Udall v. F.P.C.,* 387 U.S. 428, 450, 87 S.Ct. 1712, 1724, 18 L.Ed. 2d 869 (1967).

The record does not support FERC's conclusion that they satisfied FPA's requirement of developing a comprehensive plan. Although FERC did consider the feasibility and need for power and the project's impact on fishery and cultural resources, and did recognize that there were visual and recreational resources to consider in the Sayles Flat Area, at no point was any reference made to the entire water system of which the Sayles Flat project constitutes,

a part, to the Sayles Flat project's impact on other projects in the basin, or to the other projects' impact on the Sayles Flat project. To fulfill its obligation of exploring all issues relevant to the public interest, this type of comprehensive analysis must be performed on the record. *National Wildlife Federation v. F.E.R.C.,* 801 F.2d at 1513; *Confederated Tribes and Bands of the Yakima Indian Nation v. F.E.R.C.,* 746 F.2d at 472. Therefore, we conclude that the present record does not support FERC's conclusion that they had satisfied the FPA's requirement of developing a comprehensive plan.

### III. *Remedy*

The license for the Sayles Flat Project as issued by FERC on September 26, 1983, and as amended is suspended and FERC's order denying LaFlamme's petition for rehearing is set aside. The matter is remanded to FERC for further consideration of the issues raised by petitioner LaFlamme concerning the Sayles Flat Project recreational use and visual quality, cumulative impact and need for a comprehensive plan. FERC shall consider the requirements of the Federal Power Act, the National Environmental Policy Act and all applicable regulations, and FERC shall not reinstate the license for the Sayles Flat Project or allow its operation until such time as the issues concerning the Project, recreation use and visual quality, cumulative impact and need for a comprehensive plan have been satisfied consistent with this opinion. The license suspension will have the status as a license subject to rehearing before FERC in accordance with 16 U.S.C. § 825*l*.

This panel retains jurisdiction over any further proceedings related to this matter which are filed in this court.

LICENSE SUSPENDED and REMANDED.